UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VERTEX DEVELOPMENT, LLC, a
Delaware Limited Liability
Company,

       Plaintiff,

v.                           Case No. 8:09-CV-2645-T-17TBM

MANATEE COUNTY, a Political
Subdivision of the State of
Florida,

       Defendant.

_____/

## ORDER ON SUMMARY JUDGMENT MOTIONS

This cause is before this Court on:

```
Dkt. 13  Notice - Official Record, Hearing Video, Index
Dkt. 17  Notice - Hearing Transcript
Dkt. 20  Motion for Summary Judgment (Manatee County)
Dkt. 21  Motion for Summary Judgment (Vertex)
Dkt. 26  Response
Dkt. 27  Response
```

The Complaint in this case includes Count I, in which Plaintiff Vertex Development, LLC ("Vertex") seeks a declaratory judgment under the Telecommunications Act of 1996, 47 U.S.C. Sec. 332, and Count II, in which Plaintiff Vertex seeks a mandatory injunction under 47 U.S.C. Sec. 332.

Plaintiff Vertex and Defendant Manatee County have filed cross-motions for summary judgment.

Case No. 8:09-CV-2645-T-17TBM

I.  Standard of Review

Summary judgment should be rendered if the pleadings, the
discovery and disclosure materials on file, and any affidavits,
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law.
Fed.R.Civ.P. 56(c).

> The plain language of Rule 56(c) mandates the
> entry of summary judgment after adequate time
> for discovery and upon motion, against a
> party who fails to make a showing sufficient
> to establish the existence of an element
> essential to that party's case, and on which
> that party will bear the burden of proof at
> trial.

Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

The appropriate substantive law will guide the determination
of which facts are material and which facts are...irrelevant.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All
reasonable doubts about the facts and all justifiable inferences
are resolved in favor of the non-movant.  See Fitzpatrick v. City
of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is
genuine "if the evidence is such that a reasonable jury could
return a verdict for the non-moving party."  See Anderson, 477
U.S. at 248.  But, "[i]f the evidence is merely colorable...or is
not significantly probative...summary judgment may be granted."
Id. at 249-50.

2

Case No. 8:09-CV-2645-T-17TBM

II.   Statement of Facts

1.   Plaintiff Vertex Development, LLC is a Delaware corporation whose principal place of business is in Tampa, Florida.  Plaintiff Vertex is in the business of providing service to various licensed wireless telecommunication providers by locating, leasing, zoning, constructing, and owning personal wireless service facilities.

2.   Defendant Manatee County is a political subdivision of the State of Florida.

3.   Plaintiff Vertex leased a parcel of land from River Club Golf Course, Inc., on which Plaintiff Vertex proposed to build a cellular telecommunications tower which would accommodate five wireless telecommunication providers.  Plaintiff's anchor tenant was T-Mobile South, LLC.

4.   River Club Golf Course is part of the larger River Club development.  River Club Golf Course and Club House is owned and operated independently from the River Club Homeowner's Association.  River Club is zoned Planned Development-Residential, and has a Res-1 Future Land Use Designation.

5.   River Club Golf Course is a focal point of the design of River Club.

6.   The Board of County Commissioners approved a Final Planned Development Plan for River Club Golf Course on December 17, 1987.  (Dkt. 13, MC0381-MC0393).

3

Case No. 8:09-CV-2645-T-17TBM

7.   On September 11, 1988, Manatee Joint Venture and River
Club Golf Course, Inc. filed an Application for Development
Approval of a Development of Regional Impact with the Manatee
County Board of County Commissioners, which approved the
Application on November 30, 1989 (Resolution R-89-243, Dkt. 13,
MC0606-MC652).  R-89-243 incorporated a Master Development Plan
which provided for continuous development in subphases, in
accordance with the subphase schedule incorporated therein by
reference.

8.   Manatee County adopted its Comprehensive Plan on May 11,
1989 (Manatee County Ordinance 89.01), pursuant to Ch. 163, Fla.
Stat.  The Manatee County Comprehensive Plan contains the long
range policy structure for Manatee County.  The purpose of the
Manatee County Comprehensive Plan is to protect the public good
for the long-term future of Manatee County.  The Comprehensive
Plan contains goals, objectives and policies on land use,
transportation, environmental protection, coastal protection,
affordable housing, utility services and historic preservation.

9.   Manatee County adopted its Land Development Code in
1990, pursuant to Sec. 163.3202, Fla. Stat, et seq. (Local
Government Comprehensive Planning and Land Development Regulation
Act), the general powers in Ch. 125, Fla. Stat., and the Florida
Constitution.  The purpose of the Land Development Code is to
implement the Comprehensive Plan of Manatee County by
establishing regulations, procedures and standards for review and
approval of all development and use of land in the unincorporated
portions of Manatee County, and further to foster and preserve
public health, safety, comfort and welfare in the unincorporated
portions of Manatee County.  Chapter 5 of the Land Development

4

Case No. 8:09-CV-2645-T-17TBM

Code establishes development review procedures.  Sec. 508
addresses site plans.  Chapter 6 establishes zoning districts.
Sec. 603 addresses planned development districts.  Chapter 7
establishes development standards of general applicability.  Sec.
704 addresses conditional use criteria.  The Court takes judicial
notice of the provisions of the Manatee County Comprehensive Plan
and Manatee County Land Development Code.

Sec. 508, Land Development Code, provides:

**508.1.  *Purpose and Intent*.**  The purpose of site plan
review is to ensure that development is carried out in
compliance with this Code and the Comprehensive Plan.
In addition, a site plan describing and portraying both
existing and proposed conditions of the development is
required in order that the approving body or official
can make an informed decision.

**508.2.  *Applicability.***  Pursuant to this Code, in
certain circumstances a site plan may be required as
part of a submitted application for development
approval, or may, where authorized by this Code, be
considered and approved as a separate step in the
development process.  An applicant has the option of
proceeding directly to preliminary site plan approval
without first obtaining approval of a General
Development Plan.  An applicant may be required to
proceed directly to preliminary site plan approval
where the Board determines a General Development Plan
will not provide adequate detail to assure compliance
with this Code and the Comprehensive Plan.

. . . .

**508.6.  *Factors for Reviewing Proposed Site Plans.***  In
deciding whether to recommend for approval, or approve,
a proposed site plan, the Planning Commission, Board or
Planning Director, as the case may be, shall consider
whether the proposed site plan is consistent with the
Comprehensive Plan and this Code.  In determining
whether such site plan is consistent with the

5

Case No. 8:09-CV-2645-T-17TBM

Comprehensive Plan and this Code, the Planning
Commission, Board and the Planning Director shall
consider the following factors:
**508.6.1.  *Physical Characteristics of the Site;
Relation to Surrounding Property*....**
....
**508.6.4.  *Compatibility*....**
....
**508.6.6.  *Design Quality*....**
**508.6.7.  *Relationship to Adjacent Property*....**
....
**508.6.11.  *Natural and Historic Features*....**
....
**508.6.13.  *Height*....**
....

Sec. 603.1, Land Development Code, provides:

**603.1.  *Purpose*.**  Planned development districts are
intended to be established where a proposed project
warrants greater flexibility than a standard district
provides; when the Comprehensive Plan requires a
planned development review process; or when the ability
to attach conditions to a site plan is warranted.

Planned development may be used as a vehicle to permit
developments when the innovative use of buffering and
modern design techniques mitigate the external impacts
of development and create a helpful physical
environment.  Through the utilization of a planned
district, the Board may allow mixed dwelling types
and/or housing densities; provide for the safe,
efficient, convenient, harmonious groupings of
structures, uses, facilities, and support uses; for
appropriate relationships of space, inside and outside
buildings, for intended uses; for preservation of
desirable natural features; and minimum disturbance of
natural topography.

Within Planned Development Districts, regulations
adapted to such unified planning and development are
intended to accomplish the purposes of zoning and other
applicable regulations to an equivalent or higher
degree than where such regulations are intended to
control unscheduled development on individual lots; to

6

Case No. 8:09-CV-2645-T-17TBM

promote economical and efficient land use; improve
levels of amenities for harmonious, creative design,
and a better environment.

In view of the substantial public advantage of planned
development, it is the intent of these regulations to
promote and encourage development in this form, where
appropriate, in location and character.

### 603.2. *Planned Development, Defined.*

For purposes of this Code, a planned development is:

1.  Land to be planned as a whole;
2.  Built in a single development operation or a
definitively programmed series of development
operations;
3.  To include principal and accessory structures and
uses substantially related to the character and
purposes of the district;
4.  Built according to plans, which include not only
streets, utilities, lots, building locations, and the
like; but also, site plans for all buildings intended
to be located, constructed, used and related to each
other; and plans for other uses and improvements on the
land as related to the buildings; and
5.  To include a program to provide for operation and
maintenance of such areas, facilities and improvements
for common use by the occupants of the planned
development district; but which will not be provided,
operated or maintained at general public expense.

### 603.3. *Relation of Planned Development Regulations to General Zoning, Subdivision or Other Regulations; Specific Approval to the Equal Satisfaction of Public Purposes.*

The planned development regulations which follow shall
apply generally to the initiation of and regulation of
all planned development districts.

**603.3.1.** Where there are conflicts between the special
Planned Development regulations herein and general
zoning, subdivision, other regulations or requirements;
these Planned Development regulations shall apply in
Planned Development districts unless the Board finds,

7

Case No. 8:09-CV-2645-T-17TBM

in the particular case, that provisions herein do not serve public purposes to a degree at least equivalent to such general zoning, subdivision, or other regulations or requirements.

**603.3.2.** Where actions, designs or solutions proposed by the applicant are not literally in accord with applicable Planned Development or general regulations but the Board makes a written finding in the particular case, that the public purposes of these regulations are satisfied to an equivalent or greater degree, the Board may grant specific approval for the particular case.....

**603.3.3.** Except as indicated above, and notwithstanding procedures and requirements generally in effect, the procedures and requirements set forth in this section shall apply in all Planned Development districts.

. . . .

### 603.6.  *Changes in Approved General Development Plan*

**603.6.1.** *Requests for Change.* All requests for review of changes to the General Development Plan shall include, a drawing indicating the property, a location drawing indicating the relationship of the portion to be revised with respect to the entire Planned Development district, if the revision does not include the entire Planned Development district; and such other information concerning the lot, adjoining lots, or other information to clearly represent the entire proposed change and any associated impacts upon the planned development and adjacent properties; and for determining whether the provisions of the district and this Code are being observed.

. . . .

**603.6.4.** *New Plans Required.* The following changes and similar changes, shall be considered substantial modifications requiring consideration of a new General Development Plan by the Planning Commission and Board of County Commissioners:

8

Case No. 8:09-CV-2645-T-17TBM

. . . .

**2.** Any change in use from the specifically approved use, except as listed in 603.6.2.1(11)....

### 603.7. *PDR--Planned Development Residential.*

**603.7.1.** *Intent.* It is the intent of these regulations to provide for development of residential areas in areas adequately served or in areas which can be served by necessary utilities and services, in locations that are compatible with adjacent and surrounding land uses in accord with the goals, objectives, and policies of the Comprehensive Plan and in compliance with the standards set forth herein.

It is further the intent to permit the establishment of such districts where planned development with carefully located buildings, parking and service areas and landscaped open space will provide for internal convenience and ease of use as well as external compatibility. It is further intended that PDR districts may provide a broad range of housing types appropriate to the general need of the area served.

Uses in PDR districts shall be consistent with Comprehensive Plan requirements regarding use, type, locational criteria and other applicable Comprehensive Plan criteria.

### 603.7.4. *Specific and Review Criteria.*

**603.7.4.1.** *Site Planning.* Site planning within the district shall provide protection of the development from potentially adverse surrounding influences. The orientation of the development shall generally be toward internal streets and pedestrian systems and away from adjacent local streets and other adjacent land uses....

. . . .

**603.7.4.4.** *Neighborhoods.* All Planned Residential Developments shall be designed in such a manner as to promote neighborhoods. This shall be done by creating

9

Case No. 8:09-CV-2645-T-17TBM

a neighborhood focal point within the development such as waterbodies, recreation areas or community centers.

Other methods of achieving neighborhood unity include: use of natural features, unified theme, use of greenbelts and pedestrian/bikeway corridors.

....

**603.7.4.9.** *Building Height.* The maximum height in the PDRT District is thirty-five (35) feet. However, requests to increase height above thirty-five (35) feet may be approved by the Board of County Commissioners after review of the nature of surrounding uses, and the criteria listed in 603.7.4.9 below, upon the making of a specific finding that the proposed development is compatible with the surrounding area and will not created any external impacts that would adversely affect surrounding development, existing or proposed, waterfront vistas or entranceways.

1. *Compatibility.*
   a. Whether the height of the proposed development creates any external impacts that would adversely affect surrounding development, existing or proposed, waterfront vistas or entranceway areas.
2. *Relationship to Adjacent Properties.*
   ....
   b. Whether the heights of buildings step down or otherwise provide an appropriate transition to adjacent properties.
   ....


Sec. 701, Land Development Code, provides:

**701.1.** *Purpose.* The purpose of this Chapter is to provide development standards relating to specific land uses and natural or manmade features, wherever these are to be found. The regulations of this Chapter are intended to supplement, rather than supersede the district regulations found in Chapter 6 of this Code.


Sec. 704.59. *Personal Wireless Service Facilities.*

10

Case No. 8:09-CV-2645-T-17TBM

> Purpose and Intent:
> The purpose and intent of this section is to provide
> development standards relating to specific types of
> Personal Wireless Service Facilities (PWSF).  The
> requirements established herein are deemed necessary by
> Manatee County to protect and enhance the community's
> environmental, economic and aesthetic quality, thereby
> contributing to the overall objective of promoting the
> health, safety and general welfare.

10. Sec. 704.59.2.B applies to Telecommunication Towers in all Planned Development Zoning Districts.  Sec. 704.59.2(B)(2) provides:

> In the event the telecommunications
> tower is not identified on an approved
> General Development Plan or approved
> Preliminary Site Plan as an allowed use,
> then the applicant is required to file
> an application to amend the applicable
> General Development Plan or Preliminary
> Site Plan.  In such event, the amendment
> shall be reviewed during the public
> hearing process by the Planning
> Commission and the Board of County
> Commissioners.  The criteria used by
> staff, the Planning Commission and the
> Board of County Commissioners shall be
> the general criteria for the processing
> of General Development Plans in Section
> 508.4 (Sections 508.4.1 through
> 508.4.2.3, LDC) and the criteria for
> processing a Preliminary Site Plan as
> set forth in Section 508.6 (508.6.1
> through 508.6.25.4).

11.  PDR 86-5(F) included approval of a golf course, club house and entrance boulevard, within the larger 388 +/- acre River Club development.  PDR 86-5 also notes a recorded conservation easement.

11

Case No. 8:09-CV-2645-T-17TBM

12.   Plaintiff Vertex filed its application to amend the General Development Plan of River Club Golf Course on May 21, 2009, to include the telecommunications tower as a permitted use.

13.   On June 10, 2009, Plaintiff Vertex Development supplemented its application, in response to Manatee County's Application Completeness Letter.

14.   Prior to a hearing before the Manatee County Planning Commission, Manatee County Planning Staff prepared a Staff Report recommending approval of Plaintiff's application.

15.   The Manatee County Planning Commission heard Plaintiff's application at a duly noticed public hearing held on November 12, 2009.

16.   At the hearing, Manatee County Staff recommended approval of Plaintiff's application, on the basis that Plaintiff's application was consistent with the Land Development Code and the Comprehensive Plan.

17.   The Planning Commission, by a vote of 4-2, recommended that Plaintiff's application be denied.

18.   On December 3, 2009, the Board of County Commissioners conducted a quasi-judicial hearing on Plaintiff's Application.

19.   Manatee County Staff presented a Staff Report in which Manatee County Staff recommended approval, with stipulations. The Staff Report refers to the amending Ordinance as "approving a revised Zoning Ordinance and Preliminary Site Plan (PDR-86-

Case No. 8:09-CV-2645-T-17TBM

05(P)(R2) to be substituted for Zoning Ordinance PDR-86-05(P)(R) approved on December 17, 1987 to amend the allowable uses to include a 150' high telecommunications tower within River Club Golfcourse." (Dkt. 3-4, p. 4).   The Staff Report includes a brief history of the development of River Club:

> ### History
>
> River Club was rezoned to PDR-WP-ST on November 7, 1985 (Z-85-95) for approximately 388 +/- acres. The Preliminary Development Plan for the Golf Course was approved on April 24, 1986 (PDR-86-05(P)) with the Final Development Plan (PDR-86-05(F)) approved on December 17, 1987 for approximately 388 +/- acres and included an 18 hole Golf course, Clubhouse and a Driving Range. A revision to the Preliminary Development Plan (PDR-86-05(P)(R)) was approved on March 24, 1988 with the Final Development Plan (PDR-86-05(F)(R)) on April 28, 1988.
>
> The applicant is requesting a revision to the approved Preliminary Development Plan for River Club Golfcourse (PDR-86-05(P)(R2)). Staff received an application to locate a telecommunication tower on a leased portion within the boundary of River Club Golfcourse 33.3 +/- campus. The applicant proposes to construct a 150' camouflaged telecommunication tower, equipment buildings and relocated 2 parking spaces to the south side of the existing parking lot. The tower has been camouflaged as a flag pole.

(Dkt. 3-4, p. 24).


20.   The Staff Report notes the Planning Commission Action of 11/12/2009, in which the Planning Commission recommended denial.   The Staff Report also notes Public Comment and Correspondence to the Planning Commission:

13